# IN THE COURT OF APPEALS OF IOWA

--------------------

No. 24-1933
Filed May 27, 2026

--------------------

**Joseph Jonathan Dean Shlee,**
Applicant–Appellant,

v.

**State of Iowa,**
Respondent–Appellee.

--------------------

Appeal from the Iowa District Court for Pottawattamie County,
The Honorable Donna K. Bothwell, Judge.

--------------------

**AFFIRMED**

--------------------

Alexander Smith of Parrish Kruidenier L.L.P., Des Moines,
attorney for appellant.

Brenna Bird, Attorney General, and Katherine Wenman, Assistant
Attorney General, attorneys for appellee.

--------------------

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Buller, J.

1

**BULLER, Judge.**

Does a postconviction court have discretion to deny a motion to compel the in-person testimony of two minor witnesses—a preteen child-sex-abuse victim and her year-older brother—when there is little if any competent evidence the victim recanted? After Joseph Shlee did not take advantage of the court's suggestion that a professional forensic interviewer could speak with the children, the court denied his motion for discovery and in-person testimony of the child witnesses. On our review, we discern no abuse of discretion on this issue, we reject a separate ineffective-assistance claim, and we affirm.

## BACKGROUND FACTS AND PROCEEDINGS[1]

In 2018, five-year-old M.R. disclosed to family members and investigators that Shlee would "do things" to her in the shower, touch her "private parts," touch her "peeper" (vagina) with his "pee pee" (penis), poke her in the "butt" with something he was holding, and touch her "boobs" with his hands, pinching the "little small things" on her chest. She described at least one instance in which Shlee put "medicine" on his "pee pee" before he put his "pee pee" in her "peeper." She described how it "fe[lt] like a big bump rock when it's in." And she said her "private" hurt because of Shlee.

At one point, M.R. told adult family members she wanted to be a "cop" when she grows up so she could arrest Shlee and make him stop what he was doing to her. M.R.'s grandmother reported that she found Shlee naked in bed with M.R. nearby, and she overheard Shlee "asking M.R. to get into

---

[1] We address facts that relate only to the ineffective-assistance issue in Division II of this opinion, to minimize repetition.

bed with him." M.R. reported that, when her slightly older brother P.R. saw anything suspicious and tried to intervene, Shlee told her brother: "Stop it. You're on my team."

According to M.R., when she told her biological mother what Shlee was doing, her biological mother said she didn't believe her and went back to playing Candy Crush. P.R. detailed the biological mother's drug use in his forensic interview. Other evidence filed with the minutes of testimony (including a child-protection assessment) corroborated the biological mother's methamphetamine addiction.

Shlee admitted to the accuracy of the minutes and pled guilty to two counts of sexual abuse in the third degree in 2019, after taking discovery depositions of M.R. and P.R. At Shlee's request, the court sentenced him immediately, ordering his incarceration and imposing a no-contact order prohibiting him from contact with the child.

Shlee filed a first application for postconviction relief in 2020, apparently on the same basis as the one underlying this appeal, but he voluntarily dismissed it in May 2021.[2] He filed the application giving rise to this appeal in 2022, claiming ineffective assistance of trial counsel and that the minor victim recanted or made inconsistent statements after trial. The apparent basis for interviewing the children was that the victim's biological mother (whose parental rights were terminated) made a statement during a 2022 phone call with Shlee that alluded to M.R. recanting, and the mother's brother allegedly overheard something similarly vague.

---

[2]At the PCR trial, Shlee claimed he dismissed the case because he needed to divorce his then-wife—M.R.'s biological mother—to compel her to testify for him and against the interests of M.R.

A recording of the call was admitted into evidence during the postconviction proceedings. It's hard to make out portions of the conversation, and many of the statements are (perhaps deliberately) vague with unclear pronouns and other references. We understand the implication was that M.R. was pressured into making a false statement against Shlee because someone else abused her. During the same call, Shlee threatened violence against M.R.'s biological family and her extended family. Among other overt statements, Shlee said: "Dude, I promise you I'm beating the fuck out of your mom. Like hands down, I'm putting the bitch in the ground." He also told M.R's biological mother to record M.R. if she recanted.

In a second recorded phone call admitted into evidence, Shlee made another ranting series of threats, telling M.R.'s biological mother that he spent "every day" in prison plotting and thinking about how to inflict violence upon her and her family. Near the end of that call, he told M.R.'s biological mother "I'm beating every bitch in the fucking world, I'm coming back on a nice domestic." He also told her he would "chloroform" and tie her up and "rape" her.

During a 2024 interview, M.R.'s biological mother was again non-specific about what she remembered. She essentially said that M.R. had never substantively discussed the topic of the abuse with her other than making a vague statement once about four years prior. And she expressed that she believed M.R. was abused, but she was skeptical Shlee was the perpetrator. At the point of this interview, M.R. had been removed from her biological mother's care for almost six years.

Before the postconviction trial, Shlee sought court approval and state funds to hire a private investigator. Among other things, he planned to have that investigator locate and interview then-ten-year-old M.R. He listed her

elementary-school address in the public motion, noting that her residential address was unknown. The State responded by asking for a protective order restricting Shlee or his agents from contacting M.R. The court granted funds to hire an investigator but indicated it believed a child witness should only be questioned by a forensic interviewer or other trained professional. The court specifically directed that it would "revisit this issue on a renewed motion if the circumstances warrant it."

Rather than file a renewed motion or enlist the aid of a professional trained to interview children, Shlee moved to compel M.R. and P.R. to testify in person at the postconviction trial. At the hearing on that motion, the court expressed concern that the court had essentially directed Shlee to return to court and ask for permission to have a professional interview the children, yet Shlee had not attempted to do so before moving to compel their testimony.

The State again sought a protective order. According to its filings, M.R. had just turned eleven—Shlee sexually abused her starting when she was four. M.R. has been in therapy since the criminal proceedings and, as the postconviction court put it, she "has worked hard to put the trauma of her past behind her." M.R.'s therapist testified that it would retraumatize M.R. if she was forced to testify or discuss the abuse again. And the therapist confirmed that M.R. never recanted to her during therapy. M.R.'s adoptive mother similarly testified that M.R. had worked hard to get past her trauma; M.R.'s adoptive mother feared that any testimony, interviews, or depositions would cause M.R. to significantly regress. Like the therapist, M.R.'s adoptive mother testified that M.R. didn't talk in detail about the abuse but never recanted; if anything, M.R. made statements indirectly confirming the abuse happened.

Somewhat less evidence was developed regarding P.R. at the hearing. He saw the same therapist as M.R., who similarly testified he would be emotionally or psychologically harmed if forced to discuss the abuse he witnessed. He also had not recanted any past statements. His adoptive mother speculated that, if questioned, he would be so upset he might not communicate at all. The specific rationale for Shlee seeking to question P.R. in the postconviction proceedings does not appear in this record.

The postconviction court weighed Shlee's claimed need for testimony from the child witnesses "against the trauma that would be suffered by the children if forced to discuss the abuse." In doing so, the court emphasized that Shlee had other witnesses he could question regarding the alleged recantation, he previously had the opportunity to question the children in the criminal proceedings and exercised that right in depositions, and he had no right to confront witnesses in a civil proceeding under chapter 822 (2022). For these reasons, the court denied Shlee's requests to conduct discovery regarding or compel the in-person testimony of the two children.[3]

M.R.'s biological mother testified at trial that, when the sexual abuse came to light, she was living "on the streets," using drugs including

---

[3] There is an ambiguous reference to a subpoena in the transcript and in Shlee's appellate brief. But, as the State observes in its brief, no subpoena was filed to the docket, and no written ruling expressly quashes a subpoena. Given that the subpoena is not part of the record, we cannot review any issue relating to it independent of the motion for in-person testimony. And we recognize that, because the children appear to no longer reside in Iowa, there is a question whether an Iowa subpoena would be valid without invoking extraordinary procedures. *See* Iowa Rs. Civ. P. 1.1701, 1.1702.

We remind parties challenging subpoena issues to ensure the subpoenas are made part of the record, such as by filing them as a hearing exhibit or an attachment to a pleading. The courts' electronic filing system does not automatically docket subpoenas signed by the clerk.

methamphetamine, and having problems with the law. She admitted to a founded child-abuse report against her, which led to removal of the children from her legal custody. And she admitted to a forgery conviction, among others.

To the best of her recollection, M.R.'s biological mother said she did not see Shlee perpetrate sex abuse on M.R. She also did not recall telling Shlee's trial counsel that she thought Shlee was innocent. When asked whether she had ever said something like that, she responded: "I mean, I don't know what happened. Do I want to believe that or think that? No, I don't. I mean, nobody does." When asked whether M.R. had recanted, M.R.'s biological mother recalled some ambiguous statements that M.R. made about not liking a similar-aged male child in the house. She thought maybe this was M.R.'s way of recanting, but she wasn't sure. And she said that her brother, the child-victim's uncle, was present for M.R.'s ambiguous statement.

The uncle—who was best friends with Shlee before the abuse—was incarcerated at the time of the postconviction trial. He testified, though he was not pleased to be involved in the proceedings. He said he had never heard M.R. discuss the abuse or recant, and he denied making any statements to that effect. When asked why he was friends with Shlee in the past but not anymore, the uncle responded: "Because he's a sex offender."

Shlee testified and maintained he did not sexually abuse M.R. He admitted to his extensive criminal and substance-abuse histories, including two decades using methamphetamine and multiple crimes of dishonesty. Despite maintaining his innocence, he said that "for a four-year-old to come up with the situations and the actual incidents out of thin air, there's no way. This stuff happened somewhere because just the imagination of a four-year-

old would never have come up with this stuff." He also described M.R.'s deposition testimony as emotionally devasting, to the point he "started shutting down and just imploding about it."

On cross-examination, Shlee admitted to threatening M.R.'s biological mother and her mother (M.R.'s grandmother). At one point he said he "didn't care if it was now or nine years from now," he was "coming for them all." He said he blamed M.R.'s biological mother for him being in prison.

An Iowa Department of Health and Human Services (HHS) protection worker testified regarding her involvement with the family before, during, and after the sexual abuse was reported. She described Shlee's admissions to her regarding his addiction to methamphetamine, what she characterized as his "sex addiction," and her opinion that he had problems with boundaries and sexual behavior. Part of Shlee's self-report to the HHS worker was that he had once had sex with two hundred women in one-hundred-twenty days. The worker also recalled Shlee's description of personal lubricant in the home, noting it was consistent with products preschooler M.R. described Shlee using on his penis before perpetrating sexual abuse against her.

An outcry witness—M.R.'s biological father's then-girlfriend—testified regarding M.R.'s initial disclosure of the abuse and confirmed that M.R. never subsequently recanted. She also recorded one of M.R.'s early disclosures, and that recording was presented to the postconviction court.[4]

M.R.'s adoptive mother testified at the postconviction trial and essentially repeated her testimony from the earlier hearing: M.R. never

---

[4] The context surrounding the recording is not entirely clear, but M.R. said "Joe" (Shlee) was "touching [her] private parts" "when [her] grandma was sleeping."

recanted and instead made at least implicit statements that Shlee had abused her. One of M.R.'s frequent babysitters also testified that M.R. never spoke about the abuse or recanted.

Following trial, the postconviction court denied relief. The court found trial counsel's "version of events to be more believable" than Shlee's claims on the issue of effective assistance, noting substantial portions of Shlee's testimony were directly contradicted by the guilty-plea transcript. The court also denied Shlee's newly-discovered-evidence claim, emphasizing that M.R.'s biological mother admitted she was on drugs when she allegedly said M.R. may have recanted and that she didn't remember making such a statement. The court also credited testimony from M.R.'s adoptive mother, father, father's ex-girlfriend, and babysitter—all of whom testified that M.R. never recanted.

Shlee appeals, challenging whether the postconviction court abused its discretion when it declined to compel M.R. and P.R. to testify in-person at the postconviction trial and reprising his ineffective-assistance claim.

## STANDARD OF REVIEW

We generally review postconviction rulings for correction of errors at law. *Doss v. State*, 961 N.W.2d 701, 709 (Iowa 2021). We review discovery matters and whether to compel postconviction trial testimony for an abuse of discretion. *Varney v. State*, 475 N.W.2d 646, 651 (Iowa Ct. App. 1991) (en banc). And we review ineffective-assistance claims de novo. *Doss*, 961 N.W.2d at 709.

## DISCUSSION

We consider Shlee's claims regarding the testimony of the child witnesses and the effectiveness of trial counsel separately, given the distinct standards of review.

### I.     Testimony of Child Witnesses

Shlee first argues the postconviction court abused its discretion in restricting discovery and not compelling the in-person testimony of the child witnesses. The court below relied on our published decision in *Varney* to guide its analysis, so we start there. *See* 475 N.W.2d 646.

A jury convicted Varney of six counts of sexual abuse in the second degree for participating in the gang rape of his two preteen daughters. *Id.* at 647–48. He sought postconviction relief alleging, among other claims, that one of the victims had told her grandmother that she, the other victim, or both had lied at trial, and the grandfather allegedly overheard that statement. *See id.* at 649. One of the victims submitted an affidavit averring that she said what she did to please her grandmother and that she stood by her original testimony; she also made similar statements to her guardian ad litem (GAL). *Id.* at 650. A social worker and the GAL opined that questioning the victims would be seriously detrimental to their emotional recovery. *Id.* The postconviction court there found "Varney had produced no credible evidence to indicate the girls had lied at the criminal trial" and barred discovery of the victims. *Id.* We affirmed, finding no abuse of discretion and accordingly that the postconviction court "weighed the interests of Varney's need for the information with the girls' need for protection" from further trauma, "especially in the light of the suspicion with which we view recantations of trial testimony." *Id.* at 651.

Shlee does not urge that *Varney* was wrongly decided. He instead urges us to distinguish it, pointing out: (1) Varney had the opportunity to question the victims at his criminal trial; (2) the strength of evidence in *Varney* that the victims had not actually recanted; and (3) the involvement of a GAL and affidavit from one of the victims.

We are not persuaded to distinguish *Varney* on any of these bases. First, Shlee had the opportunity to question the child witnesses in criminal discovery depositions, and he did so. The only reason he did not question them at a criminal trial was that he pled guilty to obtain the benefit of the bargain and substantially reduce his sentencing exposure. He cannot complain now that he did not get another chance to cross-examine them. Second, the evidence in this case is not so dissimilar from *Varney*. *See id*. at 649–50. If anything, the evidence that M.R. ever recanted is less than that in *Varney*, given the biological mother's at-best-inconsistent testimony about an ambiguous statement here compared to the *Varney* victim allegedly admitting she lied. *Cf. id*. at 650. And the evidence M.R. did not actually recant from multiple witnesses is broadly similar to the *Varney* record. *See id*. at 650–51. Last, it is true that *Varney* involved a GAL and an affidavit, but we are not convinced that is materially different from the testimony from the adoptive mother and the therapist here, given M.R.'s age.

Having concluded *Varney* is not distinguishable, we look to apply its holding. It tasked the postconviction court with weighing Shlee's need for the evidence against the victims' need for protection, in light of the skepticism with which the courts view alleged recantations. *Varney*, 475 N.W.2d at 650–51. And that's exactly what the court did here. It concluded "the trauma" that would be inflicted on the children "far outweighs the need for [their] testimony" and denied the motion to compel in-person testimony.

We discern no abuse of discretion. And we note that court's subsequent fact-finding that M.R.'s biological mother's statement was "unreliable" also supports following *Varney*, where we affirmed based in part on that postconviction court finding "no credible evidence" of recantation. *Id.* at 650. We defer to the postconviction court's assessment of credibility. And even if we didn't, M.R.'s biological mother's drug use, history of problems with HHS and law enforcement, and Shlee's recorded attempts to threaten and coerce her family all weigh against finding any credible evidence M.R. recanted.

In affirming, we acknowledge Shlee's contention that the traumatization of child victims through in-person testimony is not an "undue burden" as that term of art is used in discovery. Our decision in *Varney* rejected that argument, and we do so again today. *Id.* at 650–51. And we think this conclusion is consistent with the balancing test contemplated in broader discovery precedent, like *In re Dethmers Manufacturing Co.*, 985 N.W.2d 806, 814–15 (Iowa 2023).

We also note Shlee's concession in the briefing that allowing a professional like a forensic interviewer to speak with the child-victims "was a reasonable compromise," as suggested by a district judge earlier in the proceedings. The problem with this concession is that Shlee didn't pursue that remedy below. Instead, he sought to compel the child witnesses' in-person testimony at the courthouse—essentially the most aggressive and traumatic way to question them. We cannot fault the postconviction court for not ordering something Shlee did not ask for despite the court's suggestion, and we express no opinion on whether such a compromise was required or even advisable.

Last, we acknowledge a dispute between the parties regarding the factual basis for the underlying offenses. In his reply brief, Shlee asserts the State should not be allowed to rely on the minutes of testimony to understand the facts of the crime, since the minutes are just "words on a piece of paper that the State . . . filed with the court." He goes on to claim his petition asserting his actual innocence is "equally compelling evidence." But that isn't true. Shlee admitted to the accuracy of the minutes of testimony when pleading guilty, giving the court express permission to rely on them as the factual basis for his crimes. And the State never agreed to the actual-innocence claims in Shlee's petition. We are not persuaded by this argument, and it doesn't advance any of Shlee's claims on appeal.

## II.    Ineffective Assistance

Shlee also claims the district court erred in rejecting his ineffective-assistance challenge. He essentially argues his plea wasn't valid because trial counsel bullied him into accepting the plea deal.

Shlee's trial counsel testified at the postconviction trial. He explained that he had handled hundreds if not more than a thousand class "A" and "B" felonies during his career, more than one hundred of which were tried to verdict. He also had experience specifically with child-sex-abuse cases. He explained that an earlier plea offer in the case was contingent on not deposing the child victims, and that Shlee wished to depose the children anyway. He explained that, when the matter eventually proceeded to an on-the-record guilty plea after depositions, he believed Shlee entered the plea voluntarily. With limited recollection due to the passage of time, he did not remember Shlee yelling, screaming, crying, or anything like that. He denied yelling at Shlee, and he did not recall telling him he had to take the deal or otherwise trying to pressure him into pleading guilty. After preparing for and being

13

questioned at the postconviction trial, trial counsel did not believe there was anything he should have done differently while representing Shlee. He maintained he would have taken the case to trial if that's what Shlee wanted him to do.

The transcript of the plea hearing includes a lengthy oral colloquy consistent with trial counsel's recollection. Shlee told the court he had reviewed the minutes of testimony and trial information, that the minutes were accurate, and that he had attended depositions. Trial counsel told the court Shlee was pleading guilty "for the benefit of the bargain," to substantially reduce his sentencing exposure, and in part because one or more potential defense witnesses were no longer cooperating. Shlee told the court no one had had made any threats or promises to get him to plead guilty, he understood the applicable penalties, and he understood the rights he was giving up. Shlee told the court he was "guilty" and requested to be sentenced "now" rather than at a later date. The court expressly found the plea was made knowingly, voluntarily, and intelligently.

The record indicates Shlee was "disruptive and distracting" during trial counsel's postconviction testimony, shaking his head and making other movements that led the court to admonish him. He testified that he did not like trial counsel's attitude during the earlier representation, and Shlee thought counsel was "super arrogant and super narcissistic." He said that counsel started recommending he consider taking a plea deal after M.R.'s biological mother stopped cooperating with their defense strategy. Shlee was thirty-two years old at the time of the plea but said he was so emotionally overwhelmed he had to call his father and his aunt and have them talk to trial counsel. He claimed that, after the calls, counsel started "yelling at" and

"intimidating" him. He described himself to the postconviction court as a "fucking spineless puke."

Shlee's father testified that he remembered a call from Shlee shortly before Shlee pled guilty, and that Shlee was emotional and seemed to not know whether to take the deal when they spoke. He separately remembered a phone call from trial counsel just after Shlee's plea in which counsel explained to him why the negotiated resolution was a good outcome given the risk a jury would believe the victim at trial. And he then took a phone call from Shlee, in which Shlee apparently regretted his decision to accept the plea agreement. Shlee's aunt testified to similar phone conversations.

In resolving the competing testimony, the postconviction court found trial counsel's "version of events to be more believable." The court also observed that counsel's version of events was supported by the transcript and Shlee's version was contradicted by it. Based on these contradictions, the court found Shlee "discredited himself" at the postconviction trial. The court found counsel did not breach an essential duty and denied relief.

To establish counsel was ineffective, Shlee had to prove breach of an essential duty and constitutional prejudice. *Irving v. State*, 533 N.W.2d 538, 540 (Iowa 1995). "To establish the first element of the test, the [postconviction applicant] must overcome the presumption that the counsel was competent and demonstrate that, when considering the totality of the circumstances, the counsel's performance was not within the normal range of competency." *Id.* On the second element, prejudice in the context of a guilty plea means "a reasonable probability that, but for counsel's errors, [the applicant] would not have pleaded guilty and would have insisted on going to trial." *Id.* at 541; *see Hill v. Lockhart*, 474 U.S. 52, 57–59 (1985). In assessing prejudice, we weigh the benefit of the bargain a defendant received by

pleading guilty against any evidence the defendant would have withdrawn his plea and demanded a trial with different counsel. *Cf. State v. Hallock*, 765 N.W.2d 598, 606 (Iowa Ct. App. 2009).

As to breach, we agree with the postconviction court that Shlee did not carry his burden. We defer to that court's credibility assessment, as it saw Shlee and trial counsel's testimony. But even if we didn't defer, we would independently conclude Shlee's clams were not credible as compared to the transcript of his guilty plea. *See Arnold v. State*, 540 N.W.2d 243, 246 (Iowa 1995) ("Our cases recognize that, when an applicant's assertions concerning the knowing and intelligent nature of a guilty plea are directly contradicted by the record, the applicant bears a special burden to establish that the record is inaccurate."). Shlee's claims fail under the first prong of the ineffective-assistance framework.

And even if Shlee had proven breach, we would still affirm because he has not proven the reasonable probability he would have demanded a trial with different counsel. Trial counsel's contemporaneous representations, backed up by his recollection, make clear that the plea was the product of Shlee's reasoned strategic choice to reduce his sentencing exposure (including avoiding a habitual-offender enhancement) after his best or only theory of defense—which relied on the jury believing testimony from M.R.'s biological mother—crumbled. This is exactly the kind of evidence that suggests a criminal defendant rationally took advantage of the bargain when pleading guilty, and buyer's remorse after the fact supplies no basis for disturbing a plea in this context. *Cf. Hallock*, 765 N.W.2d at 606.

## DISPOSITION

Finding no abuse of discretion in the postconviction court's handling of the child witnesses, and agreeing with that court's conclusions regarding the effectiveness of counsel, we affirm the denial of postconviction relief.

**AFFIRMED.**